**Affirmed and Majority and Dissenting Opinions filed June 8, 2021.**



**In The**

# Fourteenth Court of Appeals

### NO. 14-19-00839-CR

**ALAN WILLIAM NULL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 209th District Court
Harris County, Texas
Trial Court Cause No. 1443617**

## DISSENTING OPINION

A jury convicted Appellant Alan William Null of sexual assault of a child. At the punishment phase, the jury (over Appellant's timely and overruled objections) (1) heard testimony from Mary Symonds ("Symonds") concerning DNA evidence connecting him to an extraneous sexual assault, (2) saw Symonds' report (based on an out-of-state laboratory's testing) that connected Appellant to the assault, and (3) saw a nurse examiner's records concerning the extraneous assault. Appellant was sentenced to 60 years' confinement.

Appellant timely appealed, arguing the trial court's admission of said evidence was inadmissible based on Texas Rule of Evidence 702. I agree the foregoing evidence was inadmissible under Texas Rule of Evidence 702, that Appellant timely objected to its admission, and that Appellant was harmed by its erroneous admission. Therefore, I dissent and would reverse and remand to the trial court for a new trial on punishment.

## I.     Relevant Facts

Appellant timely objected both in writing pre-trial and at trial (and obtained a running objection) concerning Symonds' testimony. These objections specifically invoked the Confrontation Clause, Texas Rule of Evidence 702, Symonds' lack of personal knowledge, and the resulting unreliability of her testimony. Appellant's objections were overruled, Symonds testified, and the trial court admitted both her report and a nurse examiner's records concerning the extraneous assault.

Symonds testified that she was previously a DNA analyst with the Houston Forensic Science Center (an accredited laboratory) for five years, that she would "analyze profiles obtained from *evidence*" and "do the comparison of *evidence* to a reference and then write the report and draw the conclusions we obtained," and that she had testified 30 or 40 times in Harris County.[1] She explained that at the Houston Forensic Science Center, DNA would be tested in four steps: (1) extraction, (2) quantification, (3) amplification, and (4) tagging. She further explained that she (1) was asked to perform a comparison between the "*evidence* that was processed at Bode Laboratories," (2) "determined if there was any profiles that were formed to . . . do a comparison," and (3) compared said *evidence* to

---

[1] Emphasis added.

2

known buccal swabs from Appellant.[2]  Symonds testified that Bode performed each of the foregoing steps on portions it received from the Houston Forensic Science Center and that her role was to ensure the data was "in compliance with their operating procedures"; "basically", she ensured "that those four steps that we do in our lab, they completed, as well, with the same standards that we set . . . so I would go through, check all of their data, check all of their worksheets, and make sure that they had everything signed and dated and filled in where it should've been filled in."

Symonds was not present at Bode while it was testing the samples at issue. Instead, she compared the profile she received from Bode to another profile and created a new report.  This report was admitted as State's exhibit 22 over Appellant's objection and published to the jury.  It references the previous analysis conducted at Bode; references a comparison between said analysis and "portions of known buccal swabs from [Appellant];" and concludes that based on Bode's analysis of the item in question (the Complainant's shorts), Appellant could not be excluded as a possible contributor to the DNA profile.

On cross-examination, Symonds testified that Bode Laboratories had its headquarters in Virginia, that she had never been there, and that she had never toured its lab.  She also admitted she did not know:  (1) the Bode analyst who issued Bode's report; (2) said analyst's qualifications; (3) if said analyst was properly certified (but assumed she was because she worked for Bode); (4) who performed the extraction, the quantification, or the amplification; (5) what instruments Bode used at the time; (6) whether Bode's instruments were properly calibrated (and checked her checklist to see if it was one of the controls Bode checked); (7) whether Bode's analysts followed their own protocols; (8) Bode's

---

[2] Emphasis added.

3

protocols for storage of biological specimens; (9) how Bode documented its chain of custody; and (10) who from the Houston Forensic Science Center confirmed Bode met the Center's standards or what steps Bode took. Symonds also testified that "the *evidence* electropherograms"[3] she utilized in this case were "generated by Bode."[4]

Symonds relied on Bode's work; after Bode processed the work, she "would not have regenerated the profile." When asked if she could tell whether someone at Bode was intentionally or unintentionally "screwing something up" "just by reviewing what [she] reviewed," Symonds responded, "I don't think so"; instead, she acknowledged that she was relying on the fact that that is not happening. The State produced no other witness that had personal knowledge concerning Bode's tests.[5]

## II. Waiver

The majority implicitly finds that Appellant's Confrontation Clause argument was waived on appeal. There can be little doubt that Appellant's objection to the trial court based on the Confrontation Clause conveyed to the trial court that he was objecting based on the Confrontation Clause. *See Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("While no 'hyper-technical or formalistic use of words or phrases' is required in order for an objection to

---

[3] Symonds summarized an electropherogram as a software-generated visual representation of raw data.

[4] Emphasis added.

[5] In its brief, the State contends: "The laboratory was in compliance with the FBI standards." In support, the State cites testimony from Symonds: "My understanding of how they decided, they went and did on-site visits, then they went through all of their operating procedures. They made sure that they were in compliance with the FBI standards, the national standards; they checked their standard operating procedures[.]"). Symonds admitted, however, that she had no personal knowledge of the procedures. *See* 7 RR 159 ("That's just my personal interpretation of what I heard happened.").

4

preserve an error, the objecting party must still 'let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it.'") (quoting *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 2012) (en banc))); *Bell v. State*, 881 S.W.2d 794, 803-04 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) ("objection was sufficient to put the trial court on notice"); *see also* CR 159-167 ("Defendant's Objection to Surrogate Testimony by Houston Forensic Science Analyst Mary Symonds Regarding DNA Tested by Bode Technology Pursuant to the Confrontation Clause and Texas Rule of Evidence 702").

Appellant's Confrontation Clause argument, however, was not presented on appeal. Appellant's brief quotes his verbal objection to the trial court:

> I'd like to renew my objection, subject to the [C]onfrontation [C]lause as well as Texas Rule[] of Evidence 702. Specifically, I filed a written objection in this case and I've referred to that as the specific grounds for my objection, but it's based on the [C]onfrontation [C]lause and 802 [sic] and that this witness should not be allowed to testify as to testing done by Bode.

These two sentences are the only time the Confrontation Clause is mentioned in Appellant's entire appellate brief (and he did not file a reply). These sentences also reference the foregoing "written objection" that expressly briefed the Confrontation Clause (*see* CR 159-167); under the circumstances, however, I agree with the majority that this is insufficient (1) to present the issue to us and (2) to put the State on notice that Appellant intended to present it to us.

The State further contends Appellant did not preserve his complaint concerning the reliability of DNA evidence because "no objection was made to the

5

court giving specific reasons for why the appellant thought that the State had not met one of the showings under Rule 702." Specifically, the State argues Appellant "never objected and put either the trial court or the State on notice of how its predicate that it had laid was inadequate[.]" Appellant objected under Texas Rule of Evidence 702 because "the witness [Symonds] has no knowledge as to how Bode conducted their DNA testing, or whether the person who did the testing was qualified to do it or whether he or she did it correctly." CR 159; *see also* CR 166 (Appellant objected under Rule 702 because Symonds "has no actual knowledge about the underlying methodology that Amanda Mendoza and Bode used to produce their report" and without such personal knowledge, her "scientific conclusion . . . is unreliable"). Therefore, the State's contention is without merit.[6]

Finally, the State complains that Appellant's running objection under the Confrontation Clause and Texas Rule of Evidence 702 did not preserve error because it covers "too broad of a subject matter." The State relies on *Cantu v. State*, 939 S.W.2d 627, 634 (Tex. Crim. App. 1997) (en banc). In *Cantu*, defense counsel asked for "a running objection to all these hearsay statements." *Id.* The

---

[6] The State's singular citation to *United States v. Beasley* from the Eighth Circuit in support of its counterattack is unavailing. First, it is from the Eighth Circuit and the State fails to cite any other court that follows it in any regard. Second, the district court in that case held a *Daubert* hearing to determine whether the method utilized therein was reliable. *United States v. Beasley*, 102 F.3d 1440, 1445 (8th Cir. 1996). Third, the district court at the hearing ("which consumed more than three days") heard experts from both sides, "received numerous exhibits", and "carefully set forth its particularized findings" regarding the method at issue. *Id.* The court found (1) the method had been tested and was reliable, (2) the method and its forensic use had been subjected to peer review, and (3) the use thereof had been generally accepted within the forensic science community. *Id.* at 1446. On appeal, Beasley attacked the reliability of the test, *but only after* said test had already been found reliable by the district court in a detailed order following more than three days of hearings.

Nothing like that happened here, and Appellant is not attacking the reliability of the test; instead, he is attacking the State's apparent failure to meet its burden to prove reliability. The State's reliance on readily-distinguished out-of-circuit precedent for the proposition that the trial court did not abuse its discretion when it admitted the evidence at issue belies the meritlessness of its contention.

Texas Court of Criminal Appeals concluded that (1) Cantu's objections encompassed both the Texas Rules of Criminal Evidence and the Confrontation Clause and (2) Cantu's failure to identify which one of the two he was invoking was insufficiently "specific to preserve review on appeal." *Id.* Here, Appellant's arguments put both the State and the trial court on notice that he was objecting to Symonds' testimony under Texas Rule of Evidence 702 because she lacked sufficient personal knowledge and her conclusions were unreliable. CR 159; *see also* CR 166. Given that the trial court read Appellant's objections, understood Appellant's objections, and granted a running objection "to this testimony,"[7] it appears clear to me that the trial court understood what Appellant wanted when it was in a proper position to do something about it. *See Clark*, 365 S.W.3d at 339; *Bell*, 881 S.W.2d at 803-04.

As a result, I would reject the State's contention that Appellant did not preserve his complaint under Texas Rule of Evidence 702 and conclude he specifically contended (1) Symonds had insufficient personal knowledge and (2) the State's evidence at the punishment stage concerning an extraneous sexual assault was unreliable.

---

[7] 7 RR 128-29 (After Appellant's trial counsel objected under Texas Rule of Evidence 702, he stated: "Specifically, I filed a written objection . . . based on . . . 702 that this witness should not be allowed to testify as to testing done by Bode." The Court responded: "I've read your brief. I think your argument is well thought out, well written, and relatively brilliant. However, I disagree with its ultimate conclusion; and I do believe the law allows this until some other court said otherwise. So that being said, your objection is overruled; but I will give you a running objection *to this testimony*.") (emphasis added).

## III. Analysis[8]

Appellant's appellate argument assails the admissibility of evidence under Texas Rule of Evidence 702. A witness "qualified as an expert by knowledge, skill, experience, training, or education" may present opinion testimony if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. *Wellons v. Valero Ref.-New Orleans, L.L.C.*, 616 S.W.3d 220, 229 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing Tex. R. Evid. 702; *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam); and *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 620 (Tex. 1999)). "For expert testimony to be admissible, the proponent of the testimony *must establish* that the expert is qualified and that his testimony is relevant and based upon a reliable foundation." *Id.* (emphasis added) (citing *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995)). "In evidentiary matters, a trial court is a gatekeeper, ensuring expert testimony is relevant and based on a reliable foundation. *See In re Interest of J.R.*, 501 S.W.3d 738, 748 (Tex. App.—Waco 2016, no pet.).

Appellant specifically contends that a proponent of evidence must prove

---

[8] The most direct route to analyzing the legal issues herein appears to be via the Texas Court of Criminal Appeals' holding in *Burch*. There, (1) "[a]t trial, the State offered into evidence a one-page lab report"; (2) the relevant findings in said report were conclusory and inculpatory; (3) the State offered a reviewer of said report (instead of the analyst) to sponsor its introduction into evidence; (4) the analyst was unavailable; (5) "[n]o evidence was offered as to why [the analyst] had left the laboratory; (6) the testifying witness "basically double-checked everything that was done"; (7) no evidence established the testifying witness "actually saw the tests being performed or participated in them"; (8) "[t]he appellant objected, alleging a violation of his Sixth Amendment right to confront witnesses against him"; and (9) "[t]he trial court overruled his objection and admitted the report, the underlying physical evidence, and [the inculpatory testimony at issue]." *Burch v. State*, 401 S.W.3d 634, 635-40 (Tex. Crim. App. 2013). However, *Burch* dealt with the Confrontation Clause, did not address Texas Rule of Evidence 702, and was not cited by either party on appeal (although Appellant cited it to the trial court).

8

scientific reliability by clear and convincing evidence.  I agree.  *See Jenkins v. State*, 493 S.W.3d 583, 601-02 (Tex. Crim. App. 2016) ("The proponent of the scientific evidence bears the burden of demonstrating, by clear and convincing evidence, that the evidence is reliable.") (citing *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992)); *see also* 2 Steven Goode & Olin Guy Wellborn III, *Texas Practice: Texas Rules of Evidence* § 702.5 (4th ed. 2020) ("Unless the proposed evidence is supported by appropriate validation, it cannot qualify as 'scientific knowledge' . . . .  Therefore, admissibility of scientific evidence requires a showing that it is based on scientifically valid principles.").  Thus, we should examine whether the State proved the scientific reliability of the evidence at issue via clear and convincing evidence.  *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

## A.    Reliability

Reliability of scientific evidence can be established when three criteria have been met "in any particular case":  "(a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question."  *Kelly*, 824 S.W.2d at 573 (citing Tex. R. Evid. 705; P. Giannelli & E. Imwinkelried, *Scientific Evidence* § 1-1 (1986)).  The Texas Court of Criminal Appeals could not be more clear:  "*All three criteria must be proven to the trial court*, outside the presence of the jury, before the evidence may be admitted."  *Id.* (emphasis in original).  Factors that could affect such a determination include (but are not limited to):

(1)    the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2)    the qualifications of the experts testifying;

9

(3)     the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4)     the potential rate of error of the technique;

(5)     the availability of other experts to test and evaluate the technique; the clarity with which the underlying scientific theory and technique can be explained to the court; and

(6)     the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* (formatting added) (citing 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 702[03] (1991)).

### 1.     Theory

Despite these standards and Appellant's timely and clear objection pursuant to Texas Rule of Evidence 702 concerning lack of personal knowledge and reliability, the State's appellate brief fails to cite any record evidence tending to support the proposition that it proved to the trial court via clear and convincing evidence that the evidence at issue was based upon a valid underlying scientific theory. Therefore, this argument is waived. *Compare* Tex. R. App. P. 38.2(a)(1) (subjecting appellees' briefs to most of the same requirements as appellants' briefs) *with* 38.1(i) (requiring briefs to contain "appropriate citations . . . to the record."); *see also Guajardo v. Hitt*, 562 S.W.3d 768, 781 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("It is not our duty to review the record, research the law, and then fashion a legal argument for an appellant when he has failed to do so.") (citing *Canton-Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931-32 (Tex. App.— Houston [14th Dist.] 2008, no pet.)); *Reule v. M & T Mortg.*, 483 S.W.3d 600, 617 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citing *Goad v. Hancock Bank*, No. 14-13-00861-CV, 2015 WL 1640530, at *5 (Tex. App.—Houston [14th Dist.] Apr. 9, 2015, pet. denied) (mem. op.) (holding that a "passing argument" that contains no substantive argument, analysis, or citation to the record or relevant

authorities constitutes briefing waiver)); and *Priddy v. Rawson*, 282 S.W.3d 588, 595 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (noting that "[a]s an appellate court, it is not our duty to perform an independent review" of the record for evidence supporting an appellant's position) (citing *King v. Wells Fargo Bank, N.A.*, 205 S.W.3d 731, 735 (Tex. App.—Dallas 2006, no pet.)).

Instead of endeavoring to establish that the State met its burdens, both the State's brief and the majority rely upon the well-known fact that courts are permitted to take judicial notice of select facts. *See generally* Tex. R. Evid. 201. Without evidence that the trial court took judicial notice, this is an unremarkable recitation of an unambiguous Rule. What is remarkable is that both the State and the majority agree that (1) the trial court *could have* taken judicial notice that DNA is reliable, (2) because the trial court could have done so, it effectively did so, and (3) the trial court's plausible judicial notice alleviated the State's burden to prove reliability via clear and convincing evidence. This construction misconstrues the rules concerning judicial notice; parties cannot exercise their rule-based entitlement to be heard if courts are now able to take judicial notice without notifying anyone. *See* Tex. R. Evid. 201(e) ("On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard."); *see also In re C.L.*, 304 S.W.3d 512, 515 (Tex. App.—Waco 2009, no pet.) (holding that if a court takes judicial notice *sua sponte* "it must at some point notify the parties that it has done so and give them an opportunity to challenge that decision") (citing *In re Graves*, 217 S.W.3d 744, 751 (Tex. App.—Waco 2007, orig. proceeding); *Tranter v. Duemling*, 129 S.W.3d 257, 262-63 (Tex. App.—El Paso 2004, no pet.); *In re Harman Int'l Indus., Inc.*, No. 04-00-00256-CV, 2000 WL 1060516, at *2 (Tex. App.—San Antonio July 19,

2000, orig. proceeding); and *McDaniel v. Hale*, 893 S.W.2d 652, 673 (Tex. App.—Amarillo 1994, writ denied)). Although this court has previously refused to follow *In re C.L.*, we have done so on the basis that a trial court may take judicial notice of the record without a request. *See In re A.W.B.*, No. 14-11-00926-CV, 2012 WL 1048640, at *3 (Tex. App.—Houston [14th Dist.] Mar. 27, 2012, no pet.) (mem. op.). Here, the majority's presumption that a trial court took judicial notice without notifying the parties cannot be justified by our rules or precedents.

In this case, the trial court explicitly took judicial notice one time during the trial to bring closure to an absurd exchange.[9] I therefore would conclude (1) the State failed to meet its burden to establish scientific reliability by clear and convincing evidence and (2) the trial court erred when it admitted the evidence at issue despite the absence of evidence tending to prove the reliability of the theory. *See In re S.E.W.*, 168 S.W.3d 875, 883 (Tex. App.—Dallas 2005, no pet.).[10]

---

[9] *See* 7 RR 146-47 ("Q. For reference, what's the population of Earth? A. I think last time I checked, it was about 7.8 billion. Q. Okay. A. No, that seems low. That might be Houston. Hold on. I wrote it down. Oh, yeah. The Earth's population, 7.7 billion. Houston is 2.2 billion. THE COURT: Houston is not 2.7 billion. THE WITNESS: It's at 2.7 now? THE COURT: Million. THE WITNESS: Oh, million? Did I write it wrong? THE COURT: Houston is a big place, but it's not a billion. I'll take judicial notice of that, and let's move on.").

[10] There, the Dallas Court of Appeals heard an appeal in a termination of parental rights case. A company's certified analyst testified (1) the company shipped DNA specimens to an independent laboratory in Nevada, (2) the laboratory performs the tests, (3) the laboratory sends a report, (4) he had never been to the laboratory, (5) he believed the laboratory was qualified and had excellent reliability, and (6) he "had no knowledge of how the actual tests were performed on these samples, of the protocols used for the instruments or whether those protocols were followed with these samples, and whether or not a standard was run before or after the tests." *Id.* at 883. Said analyst was the sponsoring witness of the test results. *Id.* The primary issues were "whether an expert witness was qualified to give an opinion as to the results of drug testing of hair samples and whether the opinion was reliable where the expert did not conduct the test or know which of several available tests the laboratory used." *Id.* at 878. Analyzing an objection to the admissibility of an expert witness opinion, our sister court analyzed Texas Rule of Evidence 702 and held the analyst's "interpretation of the results of the laboratory tests fails to establish that those results are reliable." *Id.*

Despite these standards, the Texas Department of Protective and Regulatory Services

## 2. Technique

The majority proceeds to fault Appellant for failing to attack the validity of the technique that applied the scientific theory at issue. In doing so, I believe the majority improperly attempts to shift the State's burden concerning the admissibility of its expert testimony to Appellant. *See Jenkins*, 493 S.W.3d at 601-02 ("The proponent of the scientific evidence bears the burden of demonstrating, by clear and convincing evidence, that the evidence is reliable.") (citing *Kelly*, 824 S.W.2d at 573). Instead of acknowledging that the State failed to meet its burden to establish the validity of the technique Bode used, the majority concludes "the trial court was free to take judicial notice that this technique is also valid." Majority Op. at 13. Our relevant rules and precedents are clear; therefore, I neither agree with nor condone the majority's construction of a new rule that foreseeably benefits only the State in criminal cases and selectively eliminates a rule-based burden that applies to other parties in other cases. We should not forge such a tool simply so that we may affirm a trial court's error.

## 3. Application

The majority also faults Appellant for failing to "produce any affirmative evidence showing that Bode's application of the technique was incorrect"; instead

(like the State here) offered no evidence explaining the scientific theory at issue or the reliability of the tests at issue; it also (like the State here) failed to ask the trial court to take judicial notice of said reliability. *Id.* at 884 (citing Tex. R. Evid. 201; *Hernandez v. State*, 116 S.W.3d 26, 29 (Tex. Crim. App. 2003) (en banc) (concluding that scientific validity and reliability of scientific theory and methodology can be established by judicial notice)). "Thus, the trial court was not presented with the information necessary for it to perform its gatekeeping function." *Id.* (citing *Hernandez*, 116 S.W.3d at 30) (concluding trial court abused its discretion in admitting drug test results of an ADx analyzer "without *any* showing of its scientific reliability or *any* reliance upon other scientific materials or judicial opinions which had found 'an ADx analyzer' a reliable methodology for determining whether a person does or does not have marijuana in his body.")). In sum, the analyst's limited expertise "could not bootstrap the reliability of the actual testing procedures done by the remote laboratory" and the trial court abused its discretion when it admitted his testimony. *Id.*

13

(according to the majority), Appellant "merely elicited testimony that Symonds had no personal knowledge of certain issues, such as whether Bode's instruments were properly calibrated, or whether the Bode analyst who performed the test was qualified." Majority Op. at 14. Appellant's elicitation of Symonds' concession that she had minimal relevant personal knowledge establishes the impossibility of Appelalnt producing affirmative evidence showing Bode's application was incorrect (despite the fact that it was not yet his burden to prove); not even the burdened State introduced any evidence capable of proving Bode's application because none of its witnesses had relevant personal knowledge concerning said application. *Cf. Braziel v. State*, No. 74139, 2003 WL 22250398, at *4 (Tex. Crim. App. Oct. 1, 2003) (evidence was sufficiently reliable because the DNA analyst who performed the testing testified to her protocols, the acceptability thereof within the scientific community, the lab's internal controls, and her compliance therewith). This result is already precluded by the Confrontation Clause.[11] *See Paredes v. State*, 462 S.W.3d 510, 517-18 (Tex. Crim. App. 2015) ("When the testifying expert has no personal knowledge of how the testing was conducted, a defendant still cannot adequately challenge through cross-examination the conclusion of that non-testifying analyst offered in that non-testifying analyst's report. For an expert's testimony based upon forensic analysis performed solely by a non-testifying analyst to be admissible, the testifying expert must testify about his or her own opinions and conclusions. While the testifying expert can rely upon information from a non-testifying analyst, the testifying expert cannot act as a

---

[11] While I acknowledge the merits of Appellant's Confrontation Clause argument have been waived and cannot serve as an independent basis for reversal, waiver does not require us to close our eyes to the fact that an unbriefed constitutional protection already precluded the State from performing a particular act (*e.g.*, proffering only one relevant testifying expert to support introduction of DNA evidence despite that person having "no personal knowledge of how the testing was conducted"). *See Paredes v. State*, 462 S.W.3d 510, 517 (Tex. Crim. App. 2015).

14

surrogate to introduce that information.").[12]

Despite the State's burdens, it introduced results from Bode's tests connecting Appellant to an extraneous sexual assault through a surrogate who sponsored the admission of evidence (in the form of a comparative report) that could not have existed but for Bode's analysis and report; if Bode had not taken steps at its out-of-state laboratory, analyzed the results, and drafted a report, there would have been nothing from which Symonds could have prepared her new report.[13] Despite her minimal personal knowledge of relevant facts concerning Bode, Symonds was the only sponsoring witness. The trial court abused its discretion when it admitted this evidence precisely because it was already inadmissible as a matter of law. *See Paredes*, 462 S.W.3d at 518. The State

---

[12] *See also Williams v. Illinois*, 567 U.S. 50, 91 (2012) (Breyer, J., concurring) ("Lower courts and treatise writers have recognized the problem. And they have come up with a variety of solutions. The New Wigmore, for example, lists several nonexclusive approaches to when testifying experts may rely on testing results or reports by nontestifying experts (*i.e.*, DNA technicians or analysts), including: . . . (4) permitting a DNA analyst to introduce DNA test results at trial without having 'personally perform[ed] every specific aspect of each DNA test in question, provided the analyst was present during the critical stages of the test, is familiar with the process and the laboratory protocol involved, reviews the results in proximity to the test, and either initials or signs the final report outlining the results'; [and] (5) permitting the introduction of a crime laboratory DNA report without the testimony of a technician where the 'testing in its pre-liminary stages' only 'requires the technician simply to perform largely mechanical or ministerial tasks . . . absent some reason to believe there was error or falsification'[.]") (citing D. Kaye, D. Bernstein, & J. Mnookin, *The New Wigmore: Expert Evidence*, §§ 4.10.2, 4.10.3 (2d ed. 2010) (internal quotation marks and footnote omitted); *id*. at § 4.11.6); *Burch*, 401 S.W.3d at 637 (the defendant was deprived of the opportunity to challenge witness's testimony because witness "could not verify that the results were properly generated").

[13] Two of the three separate writings in *Williams* recount the dangers of relying upon people without personal knowledge of the relevant facts via the trial of John Kocak in California. There, an analyst testified that DNA came from Kocak. *After* cross-examination, she "realized she had made a mortifying error. She took the stand again . . . [and testified] 'I'm a little hysterical right now, but I think . . . the two names should be switched.'" *See Williams*, 567 U.S. at 119 (Kagan, J., dissenting). "At some point during the writing of the report, someone, perhaps the testifying analyst herself, must have misread the proper original sample labeling." *Id.* at 89 (Breyer, J., concurring). "Our Constitution contains a mechanism for catching such errors — the Sixth Amendment's Confrontation Clause." *Id.* at 119 (Kagan, J., dissenting).

cannot escape its burdens simply by producing a surrogate witness with minimal knowledge of relevant facts, particularly given that personal knowledge is already required by the United States Constitution's Confrontation Clause. *See Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011) (only the presence of "that particular scientist" who produced the report would enable Bullcoming's counsel to ask "questions designed to reveal whether incompetence . . . or dishonesty" tainted the results).[14]

---

[14] *See also Williams*, 567 U.S. at 122 (Kagan, J., dissenting); *id.* at 129-30 ("By testifying in that manner, Lambatos became just like the surrogate witness in *Bullcoming* — a person knowing nothing about 'the particular test and testing process,' but vouching for them regardless . . . . We have held that the Confrontation Clause requires something more."); *id.* at 124-25 ([regarding the Confrontation Clause] "Like the lawyers in *Melendez-Diaz* and *Bullcoming*, Williams's attorney could not ask questions about that analyst's 'proficiency, the care he took in performing his work, and his veracity.' . . . He could not probe whether the analyst had tested the wrong vial, inverted the labels on the samples, committed some more technical error, or simply made up the results . . . . Indeed, Williams's lawyer was even more hamstrung than Bullcoming's. At least the surrogate witness in *Bullcoming* worked at the relevant laboratory and was familiar with its procedures. That is not true of Lambatos: She had no knowledge at all of Cellmark's operations. Indeed, for all the record discloses, she may never have set foot in Cellmark's laboratory."); *Paredes*, 462 S.W.3d at 514 ("As we observed, the testifying lab supervisor in *Burch* had no personal knowledge of the specific tests used to determine that the seized substance was cocaine as detailed in the lab report because she did not observe or perform any analysis . . . . Similarly, in *Bullcoming*, the United States Supreme Court considered both a certified lab report and testimony from an analyst who had not actually participated in or observed the testing of the defendant's blood . . . . But as the court of appeals observed in this case, Freeman had personal knowledge of the tests used, and she conducted the crucial analysis by comparing the DNA profiles and determining that the complainant's DNA profile matched the DNA from the bloodstain on appellant's T-shirt.") (citing *Paredes v. State,* 439 S.W.3d 522, 526 (Tex. App.—Houston [14th Dist.] 2014), *aff'd*, 462 S.W.3d 510 (Tex. Crim. App. 2015)); *Paredes*, 439 S.W.3d at 526; *McWilliams v. State*, 367 S.W.3d 817, 820 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (distinguished from *Bullcoming* because witness "was a supervisor, involved with every aspect of the testing process, first by determining which samples should be tested, which tests should be conducted and in what order, then through supervision, then through analysis of the data, and lastly by writing the report. She had a direct connection to the scientific test at issue."); *S.E.W.*, 168 S.W.3d at 883 (Turnage, an analyst, had no knowledge of how the tests were performed, the protocols used for the instruments, whether those protocols were followed, and whether a standard was run before or after the tests; "the actual results of the scientific tests are the relevant evidence of drug use in this case. Turnage was the sponsoring witness for the test results . . . . Turnage's 'opinion' that the samples tested positive for cocaine was beyond the scope of his expertise and based entirely on the written report he received from

## IV. Harm

Having found error, we should proceed to decide whether that error affected Appellant's substantial rights to a fair sentencing trial. The trial court's admission of Symonds' testimony, Symonds' report, and the nurse examiner's records are non-constitutional errors that are harmless unless they affected Appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). A trial court's error affects a substantial right when improperly admitted evidence has a "substantial and injurious effect or influence" on the jury's verdict. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018).

At punishment, the State invoked the name of the extraneous sexual assault victim 14 times and the Complainant's name 17 times; out of the six witnesses the State presented, five of them concerned the extraneous assault. The only evidence connecting Appellant to the Complainant was Symonds' testimony and report. The Complainant testified, but she did not describe or identify Appellant as her attacker; the Complainant also did not identify Appellant in a photo line-up. In response to this heavy reliance on improperly admitted extraneous offense, the jury sentenced Appellant to 60 years' confinement. I find it impossible to conclude the admission of evidence improperly connecting Appellant to a similar sexual assault was not harmful and would reverse and remand for a new punishment hearing. Therefore, I respectfully dissent.

---

the laboratory in Nevada. Thus he did not have expertise concerning the actual subject about which he offered his expert opinion.") (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998)).

/s/     Meagan Hassan
Justice


Panel consists of Chief Justice Christopher and Justices Wise and Hassan. (Christopher, C.J., majority).

Publish — Tex. R. App. P. 47.2(b).